RECEIVED
IN LAKE CHARLES, LA

JUL 26 2006

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA

# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

## LAKE CHARLES DIVISION

| | | |
|---|---|---|
| DUNHAM-PRICE GROUP, L.L.C. | : | DOCKET NO. 05 CV 2214 |
| VS. | : | JUDGE MINALDI |
| PORT AGGREGATES, INC. | : | MAGISTRATE JUDGE WILSON |

## MEMORANDUM RULING

Presently before the court are two Motions to Dismiss and For More Definite Statement [docs. 10, 30] pursuant to Rule 12 of the Federal Rules of Civil Procedure filed by defendant, Port Aggregates, Inc. ("PAI"). The Motions to Dismiss have been opposed by the plaintiff [docs. 18, 32].

### Facts

The plaintiff, Dunham-Price Group, L.L.C. ("DPG") is a concrete and aggregate operation. DPG and its affiliates have a controlling interest in property located at 210 Mike Hooks Road, Westlake, Louisiana which includes approximately 1200 feet of riverfront along the Calcasieu River. DPG has managed, controlled and operated this property since it was purchased by Dunham Price, Inc. in 1985.[1]

In the course of its business, DPG receives large shipments of rock and aggregate for use in making cement. Large PANAMEX vessels, ranging from 500 to 750 feet in length, typically make

---

[1] In May of 2003, Dunham Price, Inc. was merged into plaintiff, Dunham Price, L.L.C which is a wholly owned subsidiary of DPG.

1

delivery of the rock by berthing against DPG's docking facility located on the northern end of the property. Smaller barges are used for delivering the aggregate.

In October of 1993, PAI began leasing property from the Lake Charles Harbor and Terminal District at 220 Westlake Ave., Westlake, Louisiana. The property leased by PAI is located just upriver or north of DPG's property. Approximately twenty times a year, PAI also receives deliveries from large PANEMEX vessels, some as large as 725 feet in length. When PAI receives vessels of this size, they are berthed at dock BT4, located at the southern end of PAI's property. Because there is only 400 feet of riverfront at dock BT4, these vessels protrude beyond PAI's property line and extend directly in front of DPG's property for several hundred feet. In addition, PAI regularly moors barges at the southernmost dolphin of its property which also extend over DPG's property line.

The berthing of vessels of this size at PAI's facility blocks all water access to the DPG's docking facility. As a result, DPG is forced to incur demurrage costs as the PANAMEX vessels and barges scheduled to deliver to DPG must wait until vessels for PAI depart. In addition, DPG alleges that the security of its facility and the safety of its employees is compromised each time PAI berths vessels along the DPG property line because the crew and cargo are unknown entities.

This lawsuit requesting injunctive and monetary relief was filed on behalf of DPG on December 22, 2005. On February 21, 2006, PAI filed the first Motion to Dismiss and for a More Definite Statement [doc. 10]. On March 16, 2006, PAI filed a Motion to Supplement and amend their Motion to Dismiss and for a More Definite Statement, which maintained that DPG was not the proper party plaintiff. Both motions were opposed by DPG.

On April 19, 2006, PAI sought to begin discovery prior to a ruling on the Motion to Dismiss and for a More Definite Statement and prior to filing an answer to DPG's complaint. PAI sought

2

to propound over sixty interrogatories and extensive requests for the production of documents. In a conference call with the Magistrate Judge on April 28, 2006, the defendant's motion to begin discovery was denied and the Magistrate Judge ordered that formal discovery would not begin until after Rule 26 initial disclosures were exchanged.[2]

In response to PAI's concerns about the proper party plaintiff, DPG filed a First Amended and Supplemental Complaint adding Dunham Price, L.L.C. and R.E. Heidt Construction Company, in an effort to clarify the related interests between the three entities. In response to this Amendment, PAI filed a second Motion to Dismiss and for a More Definite Statement.[3]

## Motions to Dismiss

### Subject Matter Jurisdiction

The first question before the court is that of subject matter jurisdiction. The district court is a court of limited jurisdiction and can only exercise that jurisdiction which is statutorily conferred upon it by Congress.[4] The basis for federal subject matter jurisdiction must affirmatively appear in the pleadings of the party seeking to invoke jurisdiction.[5] An attack on jurisdiction should seek to determine "some discreet jurisdictional requisite" without focusing on the merits of the plaintiff's

---

[2]     On or before June 16, 2006.

[3]     The Second Motion to Dismiss and for a More Definite Statement reiterates all of the arguments contained in the first Motion, with the addition of a discussion about the proper parties, which will be discussed separately.

[4]     *Margin v. Sea-Land Services, Inc.*, 812 F.2d 973, 976 (5th Cir. 1987).

[5]     *Id.* (citing *Le Mieux Bros. v. Tremont Lumber Co.*, 140 F.2d 387, 389 (5th Cir.1944)); *See also* Fed.R.Civ.P. 8(a).

claim.[6] If the defendant challenges the plaintiff's jurisdictional allegations, the plaintiff has the burden of proving jurisdiction.[7]

A party seeking to invoke federal admiralty jurisdiction pursuant to 28 U.S.C.A. § 1333[8] over a tort claim must satisfy conditions both of location and of connection with maritime activity.[9] The location test requires the court to determine whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water.[10] The connection test raises two issues. A court, first, must "assess the general features of the type of incident involved," to determine whether the incident has "a potentially disruptive impact on maritime commerce." Second, a court must determine whether "the general character" of the "activity giving rise to the incident" shows a "substantial relationship to traditional maritime activity."[11]

In contesting the jurisdiction of this court, PAI makes much of the fact that it neither owns, operates nor controls the vessels which have caused the alleged harm to DPG. As a mere lessee of land situated on the bank of the Calcasieu Channel, PAI asserts that its operations are entirely shore-

---

[6]    *Margin*, 812 F.2d at 976 (quoting *Green v. Ferrell*, 664 F.2d 1292, 1294 (5th Cir.1982)).

[7]    *Save Our Cemeteries, Inc. v. Archdiocese of New Orleans, Inc.*, 568 F.2d 1074, 1076 (5th Cir.), *cert. denied,*439 U.S. 836, 99 S.Ct. 120, 58 L.Ed.2d 133 (1978).

[8]    In its complaint, DPG cites 28 U.S.C.A. § 1933, a section of Title 28 which does not exist, as the basis for jurisdiction. Nevertheless, it is clear from the remainder of the record that DPG intended to assert § 1333 jurisdiction and that the reference to § 1933 was a clerical error.

[9]    *Strong v. B.P. Exploration & Production, Inc.*, 440 F.3d 665, 669 (5th Cir. 2006).

[10]    *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.,*513 U.S. 527, 534, 115 S.Ct. 1043, 130 L.Ed.2d 1024 (1995) (internal citations omitted).

[11]    *Id; see also Strong*, 440 F.3d at 669.

4

based and, for that reason, the violations alleged against it are not maritime torts. This argument is unpersuasive.

Despite the fact that PAI does not own the vessels that dock at its facility, the decision to berth them in such a way as to block access to DPG's docking facility, is one that is entirely within the control of PAI as facility operator.[12] Further, it is the position of the vessels within the navigable waters of the Calcasieu Channel which has caused the alleged damage to DPG. Thus, the location test is satisfied.

The court now turns to the two-step "maritime connection" inquiry. Because of the similarity between the incidents alleged to have caused DPG damage and the activity giving rise to the incidents, the court finds it more useful in this case to begin with the second of the two queries. Mooring vessels in preparation for loading and unloading is a traditional maritime activity under the jurisprudence of this circuit.[13] Moreover, instructing these vessels to berth in such a way as to impede DPG's ability to use its own docks to receive cargo not only has the potential to disrupt maritime commerce, but allegedly does so at DPG's expense. Thus, the nexus between the "wrong" and traditional maritime activity is sufficient to find that admiralty jurisdiction exists.

Further, this court has jurisdiction under the Extension of Admiralty and Maritime Jurisdiction

---

[12]     PAI argues that the alleged damages arise in whole or in part from the acts and omissions of unidentified vessels owned, operated, controlled or piloted by persons other than PAI and that their identification and joinder are required for the complete adjudication of this claim. These vessels and their owners can be identified through future discovery. The lack of this information at this point in the litigation of these claims does not mandate dismissal.

[13]     *Green v. Vermillion Corp.*, 144 F.3d 332, 338 (5th Cir. 1998).

Act, 46 App. U.S.C.A. § 740 (the "Admiralty Extension Act").[14] The Admiralty Extension Act vests in admiralty courts jurisdiction over "all cases" where the injury was caused by a ship or other vessel on navigable water, even if such injury occurred on land.[15] DPG has alleged that PAI receives vessels and moors barges at its facility in such a way as to create a security issue at DPG's facility. The fact that this jeopardizes DPG's land facility does not matter for purposes of jurisdiction because such damage is caused by vessels on navigable water.

The court has jurisdiction over this suit pursuant to both 28 U.S.C.A. §1333 and the Admiralty Extension Act. Accordingly, PAI's motion to dismiss for lack of admiralty jurisdiction is denied.

### §15 of the Rivers and Harbors Appropriation Act of 1899

PAI next argues that DPG's claim brought pursuant to §15 of the Rivers and Harbors Appropriation Act of 1899 (the "RHA"), 33 U.S.C.A. § 409 must be dismissed because there is no private right of action under that statute. Section 15 of the RHA provides in pertinent part, "It shall not be lawful to tie up or anchor vessels or other craft in navigable channels in such a manner as to prevent or obstruct the passage of other vessels or craft." 33 U.S.C.A. § 409.

In *California v. Sierra Club*, 451 U.S. 287, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981), the Supreme Court held, based on the factors set forth in *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080,

---

[14]     In its complaint, DPG asserts general admiralty and maritime jurisdiction under 28 U.S.C.A. § 1333 but fails to assert jurisdiction under the Admiralty Extension Act, 46 U.S.C.A. § 740. If a complaint fails to cite the statute conferring jurisdiction, the omission will not defeat jurisdiction if the facts alleged satisfy jurisdictional requirements. *Margin*, 812 F.2d at 976 (citing *Hildebrand v. Honeywell, Inc.*, 622 F.2d 179, 181 (5th Cir.1980)).

[15]     *Grubart*, 513 U.S. at 532, 115 S.Ct. at 1047 - 1048 (citations omitted).

2088, 45 L.Ed.2d 26 (1975),[16] that § 10 of the RHA does not provide a private right of action.

Although *Sierra Club* addressed only the question of whether a private cause of action should be

[16] In *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975), the Supreme Court identified four factors relevant in determining whether a private action may be maintained to enforce a statute that does not expressly provide for private enforcement:

> First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted," *Texas & Pacific R. Co. v. Rigsby,* 241 U.S. 33, 39, 36 S.Ct. 482, 484, 60 L.Ed. 874 (1916) (emphasis supplied)-that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? See, *e.g., National Railroad Passenger Corp. v. National Assn. of Railroad Passengers,* 414 U.S. 453, 458, 460, 94 S.Ct. 690, 693, 694, 38 L.Ed.2d 646 (1974) ( *Amtrak* ). Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? See, *e.g., Amtrak, supra; Securities Investor Protection Corp. v. Barbour,* 421 U.S. 412, 423, 95 S.Ct. 1733, 1740, 44 L.Ed.2d 263 (1975); *Calhoon v. Harvey,* 379 U.S. 134, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964). And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law? See *Wheeldin v. Wheeler,* 373 U.S. 647, 652, 83 S.Ct. 1441, 1445, 10 L.Ed.2d 605 (1963); cf. *J.I. Case Co. v. Borak,* 377 U.S. 426, 434, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964); *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388, 394-395, 91 S.Ct. 1999, 2003-2004, 29 L.Ed.2d 619 (1971); *id.,* at 400, 91 S.Ct. at 2006 (Harlan, J., concurring in judgment).

422 U.S. at 78, 95 S.Ct. at 2088. *California v. Sierra Club, supra,* further refined the analysis, observing that when consideration of the first two *Cort v. Ash* factors fails to reveal any congressional intent to create a private right of action, the final two factors need not be reached. 451 U.S. at 298, 101 S.Ct. at 1781.

Although all four *Cort* factors continue to be relevant, more recent Supreme Court jurisprudence has shifted the emphasis among these factors to focus on legislative intent. *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 15-16); *But see Thompson v. Thompson,* 484 U.S. 174, 189, 108 S.Ct. 513, 98 L.Ed.2d 512 (1988) (Scalia, J., concurring) ("[W]e effectively overruled the *Cort v. Ash* analysis in *Touche Ross,* converting one of its four factors (congressional intent) into the *determinative factor*."). Even under the more narrow focus, however, the holding in *Sierra Club* remains good law, as the Court based its ruling in substantial part on the absence of any apparent intent on the part of Congress to create a private right to enforce § 10.

implied under Section 10 of the RHA, subsequent Fifth Circuit jurisprudence used the same

reasoning to conclude that private actions may not be brought under Section 13.[17] This court finds

the analysis in *Sierra Club* and *M/V Testbank* equally applicable to Section 15.

The legislative history supports the view that the RHA was enacted to ensure the Federal

Government's ability to prevent the obstruction of navigable waterways.[18] "There is no indication,

explicit or implicit, either to create a private remedy or to deny one." *California v. Sierra Club*, 451

U.S. at 296, 101 S.Ct. at 1780. Congress' silence on the remedy question precludes the possibility

that a private right exists under the Act. *Id* ("The federal judiciary will not engraft a remedy on a

statute, no matter how salutary, that Congress did not intend to provide."). Therefore, to the extent

that DPG asserts a claim for damages under §15 of the RHA, that claim must be dismissed.

In an effort to avoid *Sierra Club* and its progeny, DPG contends that it has asserted *violations*

of, as opposed to a cause of action under, 33 U.S.C.A. § 409 and that such violations should be used

as evidence in support of its tortious interference and breach of contract claims. DPG argues that

violations of 33 U.S.C.A. § 409 have been consistently used as evidence of a maritime tort[19] and that

---

[17] *See State of La. ex rel. Guste v. M/V Testbank*, 752 F.2d 1019, 1031 (5th Cir.1985) (en banc), *cert.* 701 *denied*, 477 U.S. 903, 106 S.Ct. 3271, 91 L.Ed.2d 562 (1986).

[18] *See Sierra Club*, 451 U.S. at 295, 101 S.Ct. at 1780 (explaining that the Supreme Court's decision in *Willamette Iron Bridge Co. v. Hatch*, 125 U.S. 1, 8 S.Ct. 811, 31 L.Ed. 629 (1888) was largely responsible for passage of the RHA. There the Court held that there was no federal common law "which prohibits obstructions and nuisances in navigable rivers." *Id.*, at 8, 8 S.Ct., at 814. The implication in that case was that in the absence of specific legislation no party, including the Federal Government, would be empowered to take any action under federal law with respect to such obstructions. *Sierra Club*, 451 U.S. at 295, 101 S.Ct. at 1780.).

[19] *See Williamson Leasing Co., Inc. v. American Commercial Lines, Inc., et al.* 616 F.Supp. 1330 (E.D.La. 1985); *Orange Beach Water, Sewer and Fire Protection Authority v. M/V Alva*, 680 F.2d 1374 (11 th Cir. 1982); *Seeley v. Red Star*

the defendant's activity is a direct violation of that standard of care and is evidence of tortious activity.

The cases cited by DPG state that a violation of §409, i.e. blocking a channel and causing a collision, is evidence of fault. Because the cause of action asserted is identical to that prohibited in §409, it is a logical extension that evidence of the §409 violation may be used as evidence of fault in the tortious interference and breach of contract claims. To the extent that a cause of action has been asserted under §409, it is reiterated that §409 does not create a private right of action and the claims filed pursuant to 33 U.S.C.A. § 409 will be dismissed.

## The doctrine of *Robins Drydock*

PAI argues that *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927), and its progeny preclude DPG's claim for damages because such damages are purely economic in nature. Under the rule of *Robins Dry Dock*, a plaintiff ordinarily cannot recover damages for economic loss resulting from the defendant's negligence absent physical harm to person or to property in which the plaintiff has a proprietary interest.[20] However, where the plaintiff asserts an intentional tort, the plaintiff's claim is taken "out of the *Robins Dry Dock* parameters."[21]

A maritime plaintiff may recover for interference with its contractual relations if "he shows

---

*Towing and Transportation Co.,* 396 F.Supp. (S.D.N.Y. 1975); and *Ingram Copr. v. Ohio River Co.,* 382 F.Supp. 481 (S.D. Ohio 1973).

[20]    275 U.S. at 308-09, 48 S.Ct. at 135-36; *M/V Testbank,* 752 F.2d at 1022.

[21]    *Showa Line, Ltd. v. Diversified Fuels, Inc.,*1991 U.S.Dist. LEXIS 14662 at 3 (E.D.La.1991).

that the interference was intentional or knowing."[22] Thus, DPG may be able to recover economic damages under a theory of intentional interference with contractual relations if it can establish that PAI (1) intentionally interfered with its contractual relations, and (2) had knowledge of DPG's contractual obligations. [23]However, DPG does not state in its complaint, or in the First Amended and Supplemental Complaint, that it is asserting an intentional tort. This argument appears for the first time in the Opposition Memorandum to the first Motion to Dismiss in which DPG contends that, "[g]iven the history of these two parties as competing businesses, [PAI's refusal] to cooperate with DPG in the scheduling of ships, and the timing of PAI's receipt of vessels in such a way as to interfere with DPG's announced intent to receive vessels on the same day and time, ...PAI's activity can be nothing other than intentional and knowing." *DPG's Opposition Memo.*, at p. 15. Viable as this argument may be, DPG cannot rely on it without asserting an intentional tort in its pleadings. To date, DPG has failed to do so. However, because Fed.R.Civ.P. Rules 9(h) and 15 provide for the liberal amendment of pleadings, DPG should be allowed to amend its complaint to include a claim for intentional interference against PAI.

**DPG's Claim under La-C.C. art. 667**

PAI contends that DPG's claim brought pursuant to La-C.C. art. 667 is barred by the doctrine of laches. It is settled law within the Fifth Circuit that courts of admiralty are not governed by any statute of limitations, recognize no arbitrary or fixed period of time within which suits may be

---

[22]     *CXY Energy, Inc. v. Jurisch,* 1992 WL 211649, 2 (E.D.La.,1992) *(quoting Dick Meyers Towing Service, Inc. v. U.S.,* 577 F.2d 1023, 1025 (5th Cir.1978), *cert. denied* 440 U.S. 908 (1978).

[23]     *Kaiser Aluminum & Chemical Corp. v. Marshland Dredging Co.*, 455 F.2d 957, 958 (5th Cir. 1972).

brought, but apply the equitable doctrine of laches to the circumstances of each case.[24] In analyzing

the validity of a laches defense in maritime or admiralty actions, the court looks to analogous state

or federal prescriptive periods to determine whether or not the claim would be timely if it were a land

based claim.[25] The analogy rule serves primarily to determine where rests the burden of proof.[26]

Where the statute has run prior to instituting suit, the plaintiff must prove either absence of prejudice

or excuse for delay to repel a claim of laches.[27]

In *Dean v. Hercules, Inc.*, 328 So.2d 69, 72 (LA 1976) the supreme court of Louisiana stated:

> An action for damages for a violation of article 667 is most closely associated with
> an action for damages based on C.C. 2315 et seq. Indeed, it can be said that a
> violation of article 667 constitutes fault within the meaning of article 2315. In effect,
> C.C. 667 imposes liability without negligence. Therefore, the prescriptive period in
> an action for damages for a violation of article 667 should be one year.

*Dean*, 328 So.2d at 72 (LA 1976)(citations omitted).[28] Thus, it is appropriate that the one-

year prescriptive period applicable to article 667 claims apply to this case by analogy. Having alleged

in its complaint that PAI has engaged in the complained-of conduct over a period of ten years,

DPG's claim under article 667 clearly falls outside of the analogous statutory period. Nevertheless,

---

[24]     *The Gertrude*, 38 F.2d 946, 948 (C.A.5 1930).

[25]     *Akers v. State Marine Lines, Inc.*, 344 F.2d 217, 220 (5th Cir. 1965).

[26]     *Mecom v. Levingston Shipbuilding Co.*, 622 F.2d 1209, 1215 (5th Cir. 1980)
"[W]hen a plaintiff files a claim in admiralty within the analogous statutory period, the defendant
must show inexcusable delay and resulting prejudice in order to establish a laches defense." *Id*
(*citing Barrois v. Nelda Faye, Inc.*, 5 Cir. 1979, 597 F.2d 881, 885).

[27]     *Id* (*citing Watz v. Zapata Off-Shore Co.*, 5 Cir. 1970, 431 F.2d 100).

[28]     See also *Cooper v. La. Dept. of Public Works*, 870 So.2d 315, 322 (La. App. 3
Cir. 2004).

DPG has also alleged that it made numerous efforts over those years to cooperate with PAI in an effort to avoid litigation. Assuming this to be true, DPG's delay is at least arguably excusable and therefore an insufficient basis upon which to sustain PAI's motion to dismiss. Further, even if DPG's delay is deemed inexcusable, if it can be shown that PAI has suffered no prejudice from the delay, then the unexcused delay alone is not sufficient to cause the claim to be dismissed.[29]

PAI devotes only a single sentence of its motion to the issue of prejudice, contending that defending a suit arising out of matters occurring over a ten-year period poses an enormous prejudice because of the loss of records and change in employees over time. In light of the general rule that the existence of laches is a question of fact to be decided by the court after weighing the equities as they appear from the facts of each case, it would be inappropriate for the court to rule on the laches defense based solely on this blanket assertion.[30] Whether DPG's delay in filing suit was or was not prejudicial to PAI, is a question of fact which cannot be disposed of properly without further exploration into the underlying facts of this dispute. Accordingly, PAI's motion to dismiss claims based on a defense of laches must be denied at this time.

**Third Party Beneficiary Claims**

PAI argues that DPG's claims alleging a third party beneficiary interest in the Port of Lake Charles Tariff No. 011A and the PAI-Port land-lease fails to state a cause of action. PAI argues that DPG has failed to plead "a condition or consideration for the contract" or the intention of PAI and the Port to make DPG a third party beneficiary.

---

[29]     *Akers*, 344 F.2d at 220.

[30]     *Esso Int'l, Inc. v. SS Captain John*, 443 F. 2d 1144, 1150 (5th Cir. 1971).

Federal maritime law recognizes the validity of the third party beneficiary theory of contracts. *See* Restatement (Second) of Contracts § 302 (1981). Under the third party beneficiary theory, contracting parties may create rights in favor of a non-contracting third party by manifesting an intent to do so.[31] The fundamental basis of this relationship is that it be 'the condition or consideration' of a contract. The objective of establishing an advantage for the third person need not be express, but may be implied from a consideration of the whole contract in light of the surrounding circumstances.[32]

Because there is no contract between DPG and PAI or the Port, and because the PAI's actions were arguably within the scope of their authority, DPG cannot maintain this action in contract unless it can establish that it is the beneficiary of what the Louisiana cases call a *stipulation pour autrui* in the PAI's contract with the Port.

Article 1890 of the Louisiana Civil Code provides that "[a] person may also, in his own name, make some advantage for a third person the condition or consideration of a commutative contract, or onerous donation; and if such third person consents to avail himself of the advantage stipulated in his favor, the contract can not be revoked."

DPG has asserted that it is a third party beneficiary of PAI's lease, PAI's permit with the Army Corps of Engineers, and the Tariff's of the Port of Lake Charles. DPG has alleged specific portions of PAI's lease as evidence of an intent to provide a benefit to DPG. For example, DPG cites

---

[31]    *Matter of Mallard Bay Drilling, Inc.,* 1994 WL 660369, *1 (E.D.La.) (E.D.La.,1994).

[32]    *C. H. Leavell & Co. v. Glantz Contracting Corp. of La.*, 322 F.Supp. 779, 783 (D.C.La. 1971); *Allen & Currey Mfg. Co. v. Shreveport Waterworks Co.*, 113 La. 1091, 37 So. 980, 984 (1905).

§8.1 of PAI's lease with the Lake Charles Harbor & Terminal District which states "[t]he Tenant agrees not to make any unlawful use of the Project Site and the Improvements, including without limitation, any use constituting a nuisance of the Project Site or to adjoining or neighboring property."[33]

The Fifth Circuit, in *Wallace v. Texaco*[34] stated that the benefit to the third party must be more than merely incidental to the contract; it must be part of the condition or consideration for the contract. The fact that a third party derives a benefit from a contract does not render the contract *pour autri*. To be a third party beneficiary, DPG must establish (1) that the contracting parties intended to convey benefits to DPG, and (2) and benefits derived by DPG were not merely incidental to the contract.[35]

DPG has not pleaded a provision of the PAI-District lease or the District Tariff No. 011A that would constitute a "condition or consideration for the contract." Likewise, there is no indication that the contracting parties clearly intended that DPG benefit from this contract. Accordingly, DPG does not have a contractual cause of action as a third party beneficiary. The Motion to Dismiss the third party beneficiary claim will be granted.

**Motion to Dismiss in Response to the First Amended and Supplemental Complaint**

After the first Motion to Dismiss was filed, DPG filed a First Amended and Supplemental Complaint. PAI filed a second Motion to Dismiss arguing that (1) DPG, Dunham Price, LLC

---

[33] DPG exh 5, §8.1.

[34] 681 F.2d 1088 (5th Cir. 1982).

[35] *Wallace* at 1092.

("DPLLC") and R.E. Heidt Construction Company, Inc. ("Heidt") have no standing to plead a private cause of action under §15 (33 U.S.C.A. § 409) of the Rivers and Harbors Appropriation Act of 1899; (2) The Amended Complaint fails to allege a maritime nexus; (3) The suit is barred by the *Robins Dry Dock* doctrine; (4) all of the vessels that were docked at the PAI have not been identified; the third pary beneficiary claims fail to state a cause of action; (5) there is no cause of action pursuant to Louisiana Civil Code Article 667; and (6) the Amended Complaint alleges that Heidt is an owner of a portion of the property which is operated and controlled by DPG and DPLLC and a landowner has no claim for business loss or demurrage charges. The second Motion to Dismiss reiterates all of the arguments from the first Motion to Dismiss with the exception of Heidt's claims. These points of law have been addressed and will not be repeated.

The Amended Complaint alleges that Heidt is an owner of a portion of the property which is operated and controlled by DPG and DPLLC and a landowner has no claim for business loss or demurrage charges. PAI argues that if Heidt is a necessary party to this lawsuit, then PAI's landlord, the Port, would also be a necessary party.

PAI initally requested clarification of the entity known as "Dunham Price Group" in the original complaint. DPG responded by amending the complaint to add DPLLC and Heidt. PAI now maintains that Heidt is not a necessary party.

Heidt owns one of the parcels of property which is blocked by the vessels received by PAI at BT4. This land is adjacent to that leased by PAI and extends to the Calcasieu River waterline. Prior to the formation of DPG, this parcel was operated by DPLLC, made a party to this action by DPG. Heidt was added out an abundance of caution, in the event that its property rights were

necessary for the adjudication of DPG's nuisance claims. Vessels that have cargo for Heidt are received by DPG at their docking facility and when vessels for PAI block access to DPG's dock, they are a also blocking Heidt's property, as well as delaying Heidt's business and causing demurrage. DPG alleges that all three entities have property interests and identical claims against PAI.

In the second Motion to Dismiss and for a More Definite Statement, PAI argues that if Heidt is a necessary party, then the Lake Charles Harbor and Terminal District, as landlord, must also be made a party. DPG argues that the Lake Charles Harbor and Terminal District has not been harmed by PAI. They are not adjacent landowners whose waterfront access is blocked by the ships docking at PAI's facility. DPG argues that if PAI believes that the Lake Charles Harbor and Terminal District has been involved in the actions that harmed DPG, then PAI is free to bring them into this suit by third party action. This court finds that the Lake Charles Harbor and Terminal District is not a necessary party.

PAI argues that the Amended Complaint does not "cure the deficiency of the pleadings" and the identity of the entity known as "Dunham Price" is still unclear. DPG amended the complaint to make the corporate succession more clear and the plaintiffs are collectively referred to as the "Dunham Price Group." The identity of DPG is sufficiently clear to proceed with this litigation.

DPG submits that when injunctive relief is requested, Motions for a More Definite Statement should be viewed with great skepticism. The Fifth Circuit has characterized the filing of a Motion for a More Definite Statement as a defensive pleading which would stall the proceedings and allow the action subject to the injunction to continue.[36] DPG asserts that their complaint has a valid basis

---

[36]     *Mitchell v. E-Z Way Towers*, 269 F.2d 126, 131-132 (5th Cir. 1959).

in law and fact, PAI has sufficient information to answer the complaint, PAI's motions to dismiss should be denied and this litigation should proceed. Subject to the ruling set forth above, this court agrees.

## Motion for a More Definite Statement

PAI argues that the complaint does not allege whether DPG's third-party beneficiary claim arises under state or federal law. It has been found, however, that the third-party beneficiary claim fails to state a cause of action and will be dismissed. Accordingly, this argument is moot.

PAI argues that the complaint states that the subject actions at "all material times," but that these actions occurred over a ten year period of time[37]. The exact dates that vessels are alleged to have docked at PAI and blocked DPG's access will be revealed in discovery. As those dates become known, PAI can raise *laches* issues. The inclusion of this information is not required at this stage of the proceeding.

DPG also alleges that PAI's "protruding vessels pose a Homeland Security risk" and that PAI "is not in compliance with the requirements of the U.S. Coast Guard regarding Homeland Security." Yet, the complaint fails to identify the statutes, rules, regulations or other legally binding requirement imposed on PAI by the US Coast Guard regarding Homeland Security. If DPG intends to pursue this claim, the complaint should be amended to include the specific laws and/or regulations that PAI is allegedly violating.

## Conclusion

1)      DPG has pleaded sufficient subject matter jurisdiction pursuant to 28 U.S.C. §1333 and

---

[37]      See discussion hereinabove on *laches* and LSA C. C. Art 667.

17

the Admiralty Extension Act. PAI's Motion to Dismiss for lack of admiralty jurisdiction will be denied;

2) The Motion to Dismiss allegations filed pursuant to 33 U.S.C. §409 and §15 of the Rivers and Harbors Appropriations Act of 1899 will be granted;

3) DPG shall be permitted to amend its complaint to include a claim for intentional interference against PAI;

4) The Motion to Dismiss DPG's claims on the basis of LSA C.C. Art 667 will be denied;

5) DPG's claims alleging third-party beneficiary interests will be dismissed;

6) The Lake Charles Harbor and Terminal District is not a necessary party, therefore the Motion for a More Definite Statement on this basis will be denied;

7) The Motion for a More Definite Statement regarding whether DPG's third-party beneficiary claim arises in state or federal law is moot;

8) The Motion for a More Definite Statement requiring "all material times" to be specifically identified prior to discovery will be denied; and

9) The Motion for a More Definite Statement requiring notice of the specific law and/or regulations which PAI is allegedly violating will be granted.

Lake Charles, Louisiana, this **26** day of July, 2006.

PATRICIA MINALDI
UNITED STATES DISTRICT JUDGE

18